

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

**FELONY**

INDICTMENT FOR THEFT OF PUBLIC MONEY,
WIRE FRAUD, AND MONEY LAUNDERING

**23-00066**

| UNITED STATES OF AMERICA | * | CRIMINAL DOCKET NO. |
|---|---|---|
| v. | * | SECTION: **SECT. L MAG. 5** |
| MELISSA J. WATSON | * | VIOLATIONS:<br>18 U.S.C. § 641 |
|  | * | 18 U.S.C. § 1343<br>18 U.S.C. § 1957 |
|  | * | 18 U.S.C. § 2 |

\* \* \*

The Grand Jury charges that:

## GENERAL ALLEGATIONS

### A. AT ALL TIMES MATERIAL HEREIN:

1.  The defendant, **MELISSA J. WATSON ("WATSON")**, was a resident of Slidell, Louisiana, within the Eastern District of Louisiana.

2.  Individual 1 was a relative of **WATSON** and a resident of Slidell, Louisiana, within the Eastern District of Louisiana.

3.  Individual 2 was a relative of **WATSON** and a resident of Slidell, Louisiana, within the Eastern District of Louisiana.

___Fee_____
_\|\)_Process_____
_X_Dktd_____
___CtRmDep_____
___Doc.No._____

4. One Direction Health Care, LLC ("One Direction") was a Louisiana limited liability company formed in or around 2015 that primarily operated as a primary care and family health clinic in Slidell, Louisiana. One Direction also advertised a suite of spa and cosmetic dermatology services through its purported subsidiary, Believers Medical and Mental Wellness Spa, LLC ("Believers Spa"), including Botox, body sculpting, liposuction, weight loss injections, and waxing, among others. **WATSON** was the owner and registered agent of One Direction.

5. One Direction held account numbers x0085 at Bank 1 ("Account x0085"), x6614 at Bank 2 ("Account x6614"), and x6927 at Bank 3 ("Account x6927"). **WATSON** and Individual 1 were signatories on Account x0085, Account x6614, and Account x6927.

6. Believers Spa was a Louisiana limited liability company formed in or around 2017 that purportedly operated as a mental health wellness center and spa. Believers Spa shared a physical address with One Direction. Believers Spa had not filed any tax returns with the United States Internal Revenue Service ("IRS"), nor reported wages to the Louisiana Workforce Commission. **WATSON** was the owner and registered agent of Believers Spa.

7. Perfect Living, LLC ("Perfect Living") was a Louisiana limited liability company formed in or around October 2018. The physical address of Perfect Living was **WATSON's** home address. Perfect Living had not filed any tax returns with the IRS, nor reported wages to the Louisiana Workforce Commission. **WATSON** was the owner and registered agent of Perfect Living.

8. Perfect Living held account number x2551 at Bank 1 ("Account x2551") and x7852 at Bank 4 ("Account x7852"), among other accounts. **WATSON** and Individual 1 were signatories on Account x2551 and Account x7852.

9. Account x2551 and Account x7852 were generally used to purchase real estate and personal items for **WATSON** and Individual 1.

10. **WATSON** also held personal account number x2156 at Bank 2 in the name of Melissa J. Watson, LLC ("Account x2156").

## COUNT 1
(Theft of Public Money)

### A. AT ALL TIMES RELEVANT:

The General Allegations section of this Indictment is re-alleged and incorporated by reference as if fully set forth herein.

### The CARES Act Provider Relief Fund

1. In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act, which was designed to provide emergency financial assistance to the millions of Americans suffering due to the COVID-19 pandemic.

2. One source of relief provided by the CARES Act was the appropriation of $100 billion to help health care providers that were financially impacted by COVID-19, as well as to provide care to patients who were suffering from COVID-19 and compensate providers for the cost of that care (hereinafter, the "Provider Relief Fund" or "PRF").

3. The United States Department of Health and Human Services ("HHS"), through its agency, the Health Resources and Services Administration ("HRSA"), oversaw and administered the PRF.

4. On April 10, 2020, HHS announced the immediate disbursement of the first approximately $30 billion from the PRF. To rapidly provide funding to providers during the pandemic, HRSA distributed payments to providers who billed Medicare fee-for-service (Parts A or B) in Calendar Year 2019 and did not have Medicare billing privileges revoked ("Phase 1

Payment"). Providers meeting these criteria automatically received the Phase 1 Payment and did not have to apply for the funding, but they were required to comply with the terms and conditions of the PRF to be eligible to retain such funding ("PRF Terms and Conditions").

5. The PRF Terms and Conditions required the provider to certify that, among other things: (a) the payment would only be used to prevent, prepare for, and respond to coronavirus, and reimburse recipients only for health care related expenses or lost revenues attributable to coronavirus; (b) all information provided by the provider relating to the payment was true, accurate, and complete; and (c) the provider would not use the Payment to reimburse expenses or losses that have been reimbursed from other sources or that other sources are obligated to reimburse. The provider also certified that full compliance with the PRF Terms and Conditions was material to the HHS Secretary's decision to disburse PRF payments to them.

6. Providers that received an initial Phase 1 Payment were then given the opportunity to apply for additional funds if they had not yet received a Phase 1 Payment equal to two percent of their gross receipts or sales or program service revenue. An additional $20 billion was allocated to providers proportional to their share of annual patient revenue ("Phase 1B Payment"). Unlike the Phase 1 Payment, providers were required to submit applications to receive the Phase 1B Payment. To retain the Phase 1B Payment, providers were required to sign an attestation confirming receipt of the funds and agreeing to the PRF Terms and Conditions.

7. HHS then announced that an additional $18 billion would be distributed to eligible providers in a Phase 2 General Distribution ("Phase 2 Payment"). Eligible providers for the Phase 2 Payment included participants in state Medicaid programs and certain Medicare providers, including those that did not receive a Phase 1 Payment equal to two percent of their total patient care revenue or had a change in ownership in 2019 or 2020. Providers were required to submit

4

applications to receive a Phase 2 Payment. To retain the Phase 2 Payment, providers were required to sign an attestation confirming receipt of the funds and agreeing to the Terms and Conditions.

8. Providers that received PRF Payments were also required to submit to HRSA "post-pay reports" disclosing, over a reporting period: (a) how the provider spent the PRF Payment(s); (b) any PRF Payments returned or rejected by the provider; (c) any other CARES Act funding received by the provider; and (d) how PRF Payments impacted the provider's medical practice, among other things ("Post-Pay Reports"). The Post-Pay Report for PRF Payments disbursed from April 10, 2020, to June 30, 2020, was due September 30, 2021. The Post-Pay Report for PRF Payments disbursed from July 1, 2020, to December 31, 2020, was due March 31, 2022. Providers submitted the Post-Pay Reports through an online portal. Providers certified that all information provided in the Post-Pay Reports was true and correct.

### One Direction Health Care, LLC

9. On or about April 10, 2020, One Direction received a Phase 1 Payment of $2,971.46 from the PRF. The payment was deposited into Account x0085. On or about April 16, 2020, **WATSON** electronically attested to the PRF Terms and Conditions on behalf of One Direction and retained the funds.

10. On or about May 12, 2020, **WATSON** submitted, and caused to be submitted, an application for a Phase 1B Payment on behalf of One Direction ("Phase 1B Application"). The Phase 1B Application represented, among other things, that One Direction's gross receipts for Calendar Year 2018 were approximately $530,000.00. The Phase 1B Application also attached as supporting documents, copies of **WATSON's** Individual Income Tax Return for Calendar Year 2018, showing an adjusted gross income of approximately $138,090.00, and **WATSON's** Form 1040, Schedule C Profit or Loss from Business (Sole Proprietorship) ("IRS Schedule C") for One

Direction, also for Calendar Year 2018, showing an adjusted gross income of approximately $396,209.00. The Phase 1B Application was electronically signed by **WATSON** on behalf of One Direction.

11. On or about June 15, 2020, One Direction received a Phase 1B Payment of approximately $7,628.54. The payment was deposited into Account x0085. On or about June 16, 2020, **WATSON** again attested to the PRF Terms and Conditions on behalf of One Direction and retained the funds.

12. On or about August 12, 2020, **WATSON** submitted and caused to be submitted, an application for a Phase 2 Payment on behalf of One Direction ("Phase 2 Application"). However, unlike the Phase 1B Application, the Phase 2 Application falsely represented, among other things, that One Direction earned revenues of approximately $39,620,900.00 in 2018—nearly seventy-five times the gross receipts for 2018 previously claimed in the Phase 1B Application. The Phase 2 Application attached the same 2018 IRS Schedule C submitted with the Phase 1B Application, which did not support the revenues claimed. The Phase 2 Application was signed electronically, purportedly by Individual 2.

13. On or about September 11, 2020, based on the false representations, One Direction received a Phase 2 Payment of $781,818.00—nearly one hundred times the Phase 1B Payment—which equated to approximately two percent of the $39 million in revenues falsely claimed in the Phase 2 Application, consistent with PRF rules. The payment was deposited into Account x0085.

14. On or about September 14, 2020, the PRF Terms and Conditions were attested to electronically, purportedly by Individual 2, and One Direction retained the funds. The PRF Terms and Conditions included the following, previously attested to by **WATSON** upon receipt of Phase 1 and Phase 1B Payments:

a. "[t]he Recipient certifies that all information it provides as part of any application for the Payment, as well as all information and reports relating to the Payment that it provides in the future . . . are true, accurate and complete, to the best of its knowledge";

b. "[t]he Recipient certifies that the Payment will only be used to prevent, prepare for, and respond to coronavirus, and that the Payment shall reimburse the Recipient only for health care related expenses or lost revenues that are attributable to coronavirus"; and

c. "[n]ot later than 10 days after the end of each calendar quarter, any Recipient that is an entity receiving more than $150,000 total in funds under the [CARES Act] . . . shall submit to the Secretary and the Pandemic Response Accountability Committee a report" of funds received.

15. Despite these attestations, on or about March 29, 2022, **WATSON** electronically submitted, and caused to be submitted, a Post-Pay Report to HRSA in which **WATSON** falsely and fraudulently represented, on behalf of One Direction, that One Direction spent the entirety of the approximately $781,818.00 payment in Calendar Years 2020 and 2021 on health care-related expenses, including approximately $307,152.00 on "Utilities/Operations" and approximately $242,923.00 on "supplies," among other falsely enumerated categories ("Phase 2 Post-Pay Report"), in order to falsely appear compliant with the Terms and Conditions.

16. **WATSON** knew at the time she submitted the Phase 2 Post-Pay Report that she had not spent the funds as represented. Instead, in Calendar Years 2020 and 2021, **WATSON** used the Phase 2 Payment primarily for the benefit of herself and Individual 1, making numerous cash withdrawals and checks payable to herself, as well using the funds, in concert with Individual 1,

to make multiple purchases of real estate for hundreds of thousands of dollars, both within and outside of Louisiana, largely in connection with a property flipping business, purchase a Range Rover Sport vehicle, purchase an approximately $53,000.00 boat and trailer, purchase an approximately $13,000.00 time share, pay off an approximately $15,000.00 truck loan for Individual 1, and pay Jefferson Parish, Louisiana, Office of Probation, approximately $32,000.00 in court-ordered restitution for Individual 1, among other personal items and services.

17. **WATSON** further falsely represented in the Phase 2 Post-Pay Report that, as of December 31, 2021, One Direction had received no additional funding under the CARES Act. In fact, by December 31, 2021, **WATSON** had received (a) over $145,000.00 through the United States Small Business ("SBA") Economic Injury Disaster Loan ("EIDL") Program, and (b) over $20,000.00 in loan funds through the SBA Paycheck Protection Program. At the time of the false and fraudulent Phase 2 Post-Pay Report, **WATSON** had also received an additional $350,000.00 in EIDL Program funds, which were first approved, in part, on or about August 12, 2021, and ultimately disbursed to One Direction on or about February 8, 2022, prior to **WATSON's** submission of the Phase 2 Post-Pay Report.

18. Further, despite already receiving over $780,000.00 in funds to which One Direction was not entitled, and despite receiving written notice from HRSA of the methodology by which PRF Payments were calculated, in or around October 2020, **WATSON** nevertheless submitted, or caused to be submitted, to HRSA, a third application for additional PRF Payments ("Phase 3 Application"). In or around January 2021, HRSA denied the application.

**B. THE OFFENSE:**

On or about September 14, 2020, in the Eastern District of Louisiana, and elsewhere, the defendant, **MELISSA J. WATSON**, aided and abetted by others, and aiding and abetting others,

known and unknown to the Grand Jury, did knowingly and willfully embezzle, steal, purloin, and convert to her own use and the use of another, or receive, conceal, or retain the same, with intent to convert it to her own use or gain, knowing it to have been embezzled, stolen, purloined or converted, money of HHS, a department of the United States, namely, an approximately $781,818.00 payment from the HHS Provider Relief Fund, that was deposited into Account x0085, to which defendant **MELISSA J. WATSON** knew she was not entitled, with the intent to deprive HHS of the use and benefit of that property, in violation of Title 18, United States Code, Sections 641 and 2.

## COUNT 2
(Wire Fraud)

### A. AT ALL TIMES MATERIAL HEREIN:

The General Allegations section and Count 1 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

#### The Small Business Administration

1. The United States Small Business Administration ("SBA") was an executive-branch agency of the United States government that provided support to entrepreneurs and small businesses. The mission of the SBA was to maintain and strengthen the nation's economy by enabling the establishment and viability of small businesses and by assisting in the economic recovery of communities after disasters.

2. As part of its efforts, the SBA provided business loans through banks, credit unions, and other lenders. Those loans had government backed guarantees.

### The CARES Act Economic Injury Disaster Loan ("EIDL") Program

3.      Another source of relief provided by the CARES Act was the expansion of an existing disaster-related program, the Economic Injury Disaster Loan ("EIDL") Program. The EIDL Program was designed to provide economic relief to eligible small businesses that were experiencing substantial financial disruption due to the COVID-19 pandemic. The SBA oversaw and administered the EIDL Program.

4.      Through the EIDL Program, the CARES Act authorized the SBA to provide working capital in the form of low interest, long-term loans. In addition, the CARES Act authorized the SBA to issue advances of up to $10,000, which did not have to be repaid.

5.      To obtain an EIDL, a qualifying business was required to submit an application to the SBA, typically through an online portal, and provide information about its operations, such as the number of employees and gross revenues for the 12-month period preceding the date of the pandemic (January 31, 2020). Applicants certified that all the information in the application was true and correct to the best of their knowledge.

6.      EIDL applications were submitted directly to the SBA. The amount of the loan was determined, in part, on the information provided by the applicant.

7.      Any funds issued under an EIDL were issued directly from the United States Treasury. EIDL funds could be used for working capital to pay fixed debts, payroll, accounts payable, and other necessary business obligations that could not be met as a direct result of the pandemic. The funds could not be used for personal or household items. In signing the loan agreement, applicants also agreed to inform the SBA of funds received from other sources.

## B. THE SCHEME AND ARTIFICE TO DEFRAUD:

8. Beginning in or around March 2020, and continuing through in or around March 2022, in the Eastern District of Louisiana and elsewhere, the defendant, **WATSON**, knowingly and with the intent to defraud, devised, participated in, and executed a scheme to defraud the SBA to obtain EIDL Program funds by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

9. The purpose of the scheme and artifice was for the defendant to unjustly enrich herself and others by obtaining EIDL Program funds under false and fraudulent pretenses, including by making false statements and representations about the use of EIDL Program funds, and other funding received under the CARES Act, and to divert proceeds of the fraud for the personal use and benefit of the defendant and others, and to further the fraud.

## C. MANNER AND MEANS:

10. The manner and means by which **WATSON** sought to accomplish the objects and purpose of the scheme and artifice included, among others:

11. On or about March 31, 2020, **WATSON** electronically submitted, an EIDL Program application to the SBA in the name of One Direction (the "EIDL Program Application"). **WATSON** represented, among other things, that One Direction earned approximately $511,523.00 in revenues in 2019. **WATSON** electronically signed and submitted the EIDL Program Application and certified that all information in the application was true and correct.

12. Based on **WATSON's** representations, the SBA authorized a loan in the amount of approximately $150,000.00. On or about May 24, 2020, **WATSON** electronically signed a Loan Authorization and Agreement for the approximately $150,000.00 EIDL under penalty of perjury and certified that she was authorized to apply for and obtain a disaster loan on behalf of One

11

Direction "in connection with the effects of the COVID-19 emergency." In the agreement, **WATSON** falsely and fraudulently certified:

> a. "[b]orrower will use all the proceeds of this Loan solely as working capital to alleviate economic injury caused by disaster occurring in the month of January 31, 2020 and continuing thereafter";
>
> b. "[n]one of the Obligations are or will be primarily for personal, family or household purposes"; and
>
> c. "[n]o claim or application for any other compensation for disaster losses has been submitted to or requested of any source, and no such other compensation has been received, other than that which Borrower has fully disclosed to SBA" ("EIDL Terms and Conditions").

13. **WATSON** concealed and disguised from the SBA that One Direction had already received Phase 1 Payment and applied for an additional Phase 1B Payment under the Provider Relief Program.

14. Based on **WATSON's** false and fraudulent representations, on or about May 27, 2020, the SBA disbursed approximately $149,900.00 in loan proceeds, which were deposited into Account x0085.

15. Shortly after disbursement, **WATSON** began using the loan proceeds for personal and household purchases, including the purchase of an approximately $40,000.00 luxury vehicle.

16. On or about June 3, 2021, **WATSON** requested a modification of the EIDL Program Application on behalf of One Direction to increase the loan amount from approximately $150,000.00 to $450,000.00. **WATSON** cited the representations made in the original EIDL Program Application as support for the modification.

17. The SBA approved the modification. On or about August 12, 2021, **WATSON** electronically signed an Amended Loan Authorization and Agreement for an additional $300,000.00 loan under penalty of perjury, and again falsely certified to the EIDL Terms and Conditions.

18. Despite her attestations, **WATSON** did not disclose to the SBA that One Direction had already received Phase 1, Phase 1B, and Phase 2 Payments from the PRF.

19. Based on **WATSON's** false and fraudulent representations, on or about August 12, 2021, the SBA disbursed approximately $300,000.00 into Account x0085. However, Account x0085 had closed. Accordingly, Bank 1 rejected the disbursement. On or about February 8, 2022, the SBA redistributed the approximately $300,000.00 to Account x6614 at **WATSON's** direction.

20. On or about February 1, 2022, **WATSON** requested a second modification of the EIDL Program Application on behalf of One Direction to increase the loan amount from approximately $450,000.00 to $500,000.00. **WATSON** cited the representations made in the original EIDL Program Application as support for the second modification.

21. The SBA approved the second modification. On or about February 8, 2022, **WATSON** electronically signed a second Amended Loan Authorization and Agreement for an additional $50,000.00 loan under penalty of perjury, and again falsely certified to the EIDL Terms and Conditions. **WATSON** again did not disclose the Phase 1, Phase 1B, or Phase 2 Payments that One Direction received from the PRF.

22. On or about February 8, 2022, the SBA disbursed approximately $50,000.00 into Account x6614.

23. On or about March 2, 2022, less than one month after receiving the EIDL Program proceeds, **WATSON** caused the transfer of approximately all $350,000.00 from Account x6614

to personal Account x2156. **WATSON** then used the funds, in part, to pay off personal credit card expenses, including for several luxury vacations for herself and Individual 1.

### D. THE OFFENSE:

On or about the date set forth below, in the Eastern District of Louisiana and elsewhere, the defendant, **MELISSA J. WATSON**, aided and abetted by others, and aiding and abetting others, known and unknown to the Grand Jury, having devised the scheme described above, for the purpose of executing the scheme, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire communication, certain writings, signals, pictures, and sounds in interstate commerce, from the SBA, located outside the State of Louisiana, to a bank account, located within the Eastern District of Louisiana, as set forth below.

| Count | Approximate Date | Description of Wire |
|---|---|---|
| 2 | February 8, 2022 | Transfer of approximately $350,000.00 in EIDL Program funds from the SBA, located outside the State of Louisiana, sent by means of an interstate wire, into Account x6614, located in the Eastern District of Louisiana. |

All in violation of Title 18, United States Code, Sections 1343 and 2.

### COUNTS 3 – 4
(Money Laundering)

### A. AT ALL TIMES MATERIAL HEREIN:

The General Allegations section and Counts 1 and 2 of this Indictment are re-alleged and incorporated by reference as if fully set forth herein.

### B. THE OFFENSE:

On or about the dates specified below, in the Eastern District of Louisiana and elsewhere, the defendant, **MELISSA J. WATSON**, aided and abetted by others, and aiding and abetting others known and unknown to the Grand Jury, knowingly engaged in monetary transactions by

and through a financial institution, affecting interstate commerce, involving criminally derived property of a value greater than $10,000, which property was derived from specified unlawful activity, that is, theft of public money as described in Count 1, and wire fraud, as described in Count 2, knowing that the property involved in the monetary transactions was derived from some form of unlawful activity, as set forth below:

| Count | Approx. Date of Transaction | Description |
|---|---|---|
| 3 | October 22, 2020 | Cashier's Check No. 884343 remitted to WATSON and Individual 1 from Account x2551 for approximately $53,508.00 for the purchase of a boat (2015 Chaparral 243 Vortex, Hull Identification Number: FGBL0182C515 2015) and Coyote Trailer (VIN: 4C91B2521FN367787). |
| 4 | March 2, 2022 | Wire transfer by WATSON of approximately $350,000.00 from Account x6614 to Account x2156 to pay off personal credit cards for vacation expenses, among other personal expenses. |

All in violation of Title 18, United States Code, Sections 1957 and 2.

## NOTICE OF FORFEITURE

1. The allegations of Counts 1 through 4 of this Indictment are incorporated herein by reference as set forth fully herein for the purpose of alleging forfeiture to the United States.

2. As a result of the offense alleged in Count 1 of this Indictment, the defendant, **MELISSA J. WATSON**, shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, any property, real and personal, which constitutes or is derived from proceeds traceable to said offense, including but not limited to:

>Approximately $250,000.00 in United States currency held in Account x6927;

>Approximately $55,000.00 in United States currency held in Account x7852;

>2017 Land Rover Range Rover Sport Utility 4D 4WD 3.0L V6 SN: SALWR22FV3HA677038; and

15

>Real Property located at 103 Galeria Boulevard (Lot 15 Galeria Commercial Park) and the adjacent Vacant Lot (Lot 16 Galeria Commercial Park), both, the lot and building are located in St. Tammany, Slidell, Louisiana.

3. As a result of the offense alleged in Count 2 of the Indictment, the defendant, **MELISSA J. WATSON**, shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(2), any property, real and personal, which constitutes or is derived from proceeds traceable to said offenses.

4. As a result of the offenses alleged in Counts 3 through 4 of the Indictment, the defendant, **MELISSA J. WATSON**, shall forfeit to the United States pursuant to 18 U.S.C. § 982(a)(1), any property, real and personal, involved in such offenses, or any property traceable to such property, including but not limited to:

>Approximately $260,000.00 in United States currency held in Account x2156;
>
>2015 Chaparral 243 Vortex, Hull Identification Number: FGBL0182C515 2015, and Coyote Trailer (VIN: 4C91B2521FN367787).

5. If any of the above-described forfeitable property, because of any act or omission of the defendant:

>a. cannot be located upon the exercise of due diligence;
>
>b. has been transferred or sold to, or deposited with, a third party;
>
>c. has been placed beyond the jurisdiction of the Court;
>
>d. has been substantially diminished in value; or
>
>e. has been commingled with other property which cannot be divided without difficulty;

the United States shall seek a money judgment and, pursuant to 21 U.S.C. § 853(p), forfeiture of any other property of the defendant up to the value of said property.

A TRUE BILL:

███████████████████████

FOREPERSON

DUANE A. EVANS
UNITED STATES ATTORNEY

_(w) for Nicholas Moses_ *[signature]*

NICHOLAS D. MOSES
Assistant United States Attorney

GLENN S. LEON
CHIEF, CRIMINAL DIVISION, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE

*[signature]*

KELLY Z. WALTERS
Trial Attorney
Criminal Division, Fraud Section
United States Department of Justice

New Orleans, Louisiana
April 14, 2023

FORM OBD-34

No. _____

## UNITED STATES DISTRICT COURT

Eastern _____ District of _____ Louisiana

Criminal _____ Division

### THE UNITED STATES OF AMERICA

vs.

### MELISSA J. WATSON

### INDICTMENT

INDICTMENT FOR THEFT OF PUBLIC MONEY, WIRE FRAUD, AND MONEY LAUNDERING

VIOLATIONS:  Title 18, U.S.C., Section 641
Title 18, U.S.C., Section 1343
Title 18, U.S.C., Section 1957
Title 18, U.S.C., Section 2

A true b[REDACTED]

Filed in open court this _____ day of _____ A.D. 2023.

_____
Clerk

Bail, $ _____

_____
KELLY ZACK WALTERS
United States Department of Justice Trial Attorney